16 F.3d 1093
 Orlando de la LLANA-CASTELLON, Ana Aracely de la
Llana-Pasquier, Orlando Jose de la Llana-Pasquier, Karen
Georgina de la Llana-Pasquier, Raquel Concepcion
Pasquier-Garay, Sara Raquel de la Llana-Pasquier, Graciela
Maria de la Llana-Pasquier, Petitioners,
v.
IMMIGRATION AND NATURALIZATION SERVICE, Respondent.
 No. 92-9534.
 United States Court of Appeals,
Tenth Circuit.
 Feb. 16, 1994.
 
 Lynn C. McMurray (Janice Radler Olson on the brief) of McMurray, McMurray, Dale & Parkinson, P.C., Salt Lake City, Utah, for Petitioners.
 Carl H. McIntyre, Jr., Attorney, Office of Immigration Litigation, Department of Justice (Stuart M. Gerson, Assistant Attorney General, and David J. Kline, Assistant Director, with him on the brief), Washington, D.C., for Respondent.
 
 
 1
 Before KELLY, Circuit Judge, SETH, Senior Circuit Judge, and KANE, Senior District Judge*.
 
 
 2
 KANE, Senior District Judge.
 
 
 3
 This is a petition for review of a decision of the Board of Immigration Appeals (BIA) denying asylum. We have jurisdiction to consider the petition under 8 U.S.C. Sec. 1105a. Petitioners, a family of Nicaraguan citizens, contend that the BIA denied them due process when it reversed the immigration judge's finding that they had a well-founded fear of persecution in Nicaragua by taking administrative notice of the fact that elections in that country had brought about a change in government. Alternatively, Petitioners argue that the BIA erred in failing to overturn the immigration judge's finding that they had firmly resettled in Honduras based on new evidence that their visas would not be renewed. We reverse.
 
 
 4
 I. Facts.
 
 
 5
 Petitioners entered the United States illegally on or about September 13, 1987. They did not present themselves to immigration authorities and were charged with deportability under 8 U.S.C. Sec. 1251(a)(1)(B) for entry without inspection. At their initial deportability hearing, Petitioners, represented by lay counsel, admitted deportability but asked permission to file a request for asylum under 8 U.S.C. Sec. 1158(a), withholding of deportation under 8 U.S.C. Sec. 1253(h), or alternatively, for voluntary departure under 8 U.S.C. Sec. 1254(e). Permission was granted and the hearing was continued to April 6, 1988.
 
 
 6
 At the April 6 hearing, the immigration judge first heard evidence on the request for asylum. Petitioners' request centered on the situation of Orlando de la Llana Castellon, the father of the family ("the father"). The father testified that he had been jailed twice in 1979 for his resistance to join Sandinista efforts to sabotage his employer and for his refusal to become a member of several Sandinista organizations. He learned shortly after being released that his brother had been killed by the Sandinistas. After these events, he fled to Venezuela, leaving his family behind.
 
 
 7
 The father then testified that he returned to Managua, Nicaragua in 1982 and began a cooperative that made fabric blankets. He was elected head of the cooperative. In 1984, when the Sandinista government reduced the amount of fabric it was willing to supply to the cooperative, diverting the supply to makers of military clothing, the father led several organized protests against the government. The Sandinistas then issued orders to arrest him and several others who had participated in the demonstration. In July 1984, the father fled alone to Honduras.
 
 
 8
 In September 1984, officers of the Sandinista army came to the family's house in Managua. They questioned the wife, who was then eight months pregnant. When she denied any knowledge of his whereabouts, the officers attempted to arrest her but were dissuaded by a local priest who was visiting the family at the time. Because of the stress of her near arrest, the wife gave birth prematurely the next day.
 
 
 9
 In December 1984, the father returned to Managua to retrieve his family. Conditions there were still dangerous, and he left quickly without them. He learned that because of his travel to Honduras the Sandinista government had branded him a "Contra" and accused him of other espionage-related crimes carrying penalties ranging from twenty years in prison to death. He secretly returned to Nicaragua in 1985 and this time succeeded in extricating his family to Honduras. The family lived in Honduras until their 1987 entry into the United States.
 
 
 10
 In his April 7, 1988 oral decision on the application for asylum, the immigration judge found that the father's early confrontations with the Sandinistas, up until 1984, did not show that he was in danger of being persecuted because "he was able to achieve employment, secure admittance to the National University, work as a[n] organizer and director of a cooperative and receive passports and travel documents from the government of Nicaragua between 1981 and 1984." R. at 104. The immigration judge did conclude, however, that the father had a well-founded fear of persecution based on events since that date. He held that the Sandinista government's issuance of arrest warrants after the father's protest over fabric supplies and its continued interest in his whereabouts established a well-founded fear of persecution. Id. at 108-09.
 
 
 11
 Nevertheless, the immigration judge denied the request for asylum, finding that it was precluded by Petitioners having firmly resettled in Honduras before coming to the United States. The immigration judge based this finding primarily on the father's passport and other immigration papers indicating that the father was granted permanent residence status in Honduras. Id. at 110-11. Finally, the immigration judge denied the request for withholding of deportation and granted Petitioners a three-month voluntary departure.
 
 
 12
 Petitioners appealed the immigration judge's decision to the BIA. They argued that the immigration judge erred in concluding that they had firmly resettled in Honduras. Petitioners offered new evidence in the form of a statement from a Honduran official that the father's residence in Honduras was temporary and conditional and that his legal residence in Honduras had been canceled.
 
 
 13
 On June 4, 1992, the BIA dismissed the Petitioners' appeal. Rather than considering their argument that the immigration judge had erred in finding they had firmly resettled in Honduras and without notice, the BIA dismissed the appeal based on its conclusion that Petitioners had no basis to support their contention they had a well-founded fear of persecution to merit a grant of asylum. In so doing, the BIA sua sponte took administrative notice of the fact that there had been a change in government in Nicaragua since Petitioners had entered this country. The BIA stated:
 
 
 14
 In this regard, we take administrative notice that the Sandinista party no longer controls the Nicaragua government. On April 25, 1990, a new coalition government, formed by parties in opposition to the Sandinistas ("UNO"), succeeded the former government of the Sandinista party following national elections and the inauguration of Violeta Chamorro as the new president. Further, the new president of Nicaragua announced a general amnesty covering the hostilities between the former Contra resistance and the Nicaraguan government and an end to military conscription. Given that the Sandinista party no longer governs Nicaragua, under the present circumstances we do not find that the respondents have demonstrated a well-founded fear of persecution by the Sandinista government were they to return to Nicaragua.
 
 
 15
 R. at 3 (footnotes omitted). The BIA did not give the Petitioners notice of its intent to make these findings, nor were they given an opportunity to present rebuttal evidence before the appeal was dismissed. Furthermore, the BIA noted that, while it has discretion to grant asylum in cases where there has been past persecution but no well-founded fear of future persecution, in this case there were no humanitarian or other compelling factors upon which to justify such a discretionary grant of asylum. Id. at 4. Finally, because the standard for withholding of deportation is more stringent than for asylum, the BIA declined Petitioners' request for this relief. Id. Petitioners now appeal.
 
 
 16
 II. Denial of Asylum Based on Administrative Notice of
 
 
 17
 Change in Government.
 
 
 18
 Petitioners first contend on appeal that the BIA erred in taking administrative notice of the change in government in Nicaragua and by inferring, based on that change, that Petitioners no longer had a well-founded fear of persecution. Petitioners premise their argument on the fact that they were not given notice of the BIA's intent to take administrative notice and were thereby denied any meaningful opportunity to rebut this inference, constituting a denial of due process.
 
 
 19
 The INS responds that the BIA's ability to take administrative notice is well supported in case law, and that it is undisputed that control of the Nicaraguan government now is in the hands of a coalition government comprised of parties opposed to the Sandinistas. In addition, the INS argues that notice and an opportunity to be heard are not required before the BIA may take administrative notice of facts bearing on a case and that, regardless, any failure to notify Petitioners of the taking of administrative notice was ameliorated by Petitioners' ability to move for reopening under BIA regulations.
 
 
 20
 We begin by noting that, while there is no constitutional right to political asylum itself, noncitizens, even those charged with entering the country illegally, are entitled to due process when threatened with deportation. See Landon v. Plasencia, 459 U.S. 21, 32, 103 S.Ct. 321, 329, 74 L.Ed.2d 21 (1982); The Japanese Immigrant Case, 189 U.S. 86, 101, 23 S.Ct. 611, 47 L.Ed. 721 (1903); Bauge v. INS, 7 F.3d 1540, 1543 (10th Cir.1993); Gutierrez-Rogue v. INS, 954 F.2d 769, 773 (D.C.Cir.1992). "The fundamental requirement of due process is the opportunity to be heard at 'a meaningful time and in a meaningful manner.' " Mathews v. Eldridge, 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976) (quoting Armstrong v. Manzo, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965)). In the adjudicative context, due process entitles a person to factfinding based on a record produced before the decisionmaker and disclosed to that person, see Goldberg v. Kelly, 397 U.S. 254, 271, 90 S.Ct. 1011, 1022, 25 L.Ed.2d 287 (1970), and an individualized determination of his interests, see Rhoa-Zamora v. INS, 971 F.2d 26, 34 (7th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1943, 123 L.Ed.2d 649 (1993). Finally, it requires that the decisionmaker actually consider the evidence and argument that a party presents. See Morgan v. United States, 298 U.S. 468, 481, 56 S.Ct. 906, 911, 80 L.Ed. 1288 (1936). On the facts of this case, we conclude that the BIA's denial of asylum to Petitioners based on facts administratively noticed violated their right to due process.
 
 
 21
 Judicial notice, and its close parallel, administrative notice, permit a court or agency to take notice of an adjudicative fact "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b). The scope of administrative notice, sometimes referred to as official notice, however, is broader than judicial notice. See Castillo-Villagra v. INS, 972 F.2d 1017, 1026 (9th Cir.1992); McLeod v. INS, 802 F.2d 89, 93 n. 4 (3d Cir.1986). The wider scope of administrative notice emanates from the administrative agency's specialized experience in a subject matter area and its consequential ability to "take notice of technical or scientific facts that are within the agency's area of expertise." McLeod, 802 F.2d at 93 n. 4. It is also compelled by the repetitive nature of many administrative proceedings. See Castillo-Villagra, 972 F.2d at 1027.
 
 
 22
 The BIA may properly take administrative notice of " 'current events bearing on an applicant's well-founded fear of persecution.' " Kapcia v. INS, 944 F.2d 702, 705 (10th Cir.1991) (quoting Kaczmarczyk v. INS, 933 F.2d 588, 593-94 (7th Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 583, 116 L.Ed.2d 608 (1991)). We have twice approved of this procedure. In Kapcia v. INS, we affirmed the BIA's order denying the petitioners asylum and withholding of departure. We held that the BIA did not err by taking administrative notice of the fact that Solidarity became part of the Polish coalition government and by consequently inferring that petitioners, Solidarity supporters, no longer had a well-founded fear of persecution in Poland. Id. at 705. More recently, in Baka v. INS, we affirmed the BIA's denial of asylum to a family of Hungarian nationals based in part on the BIA's taking administrative notice of the fact that Hungary is now a "western-style democracy," and inferring that the family no longer had a reasonable fear of communist forces. 963 F.2d 1376, 1378-79 (10th Cir.1992).
 
 
 23
 Yet simply because we have approved of this procedure in one context does not mean that it is appropriate in all. An agency's discretion to take administrative notice depends on the particular case before it. Castillo-Villagra, 972 F.2d at 1028; see also Gebremichael v. INS, 10 F.3d 28, 39 (1st Cir.1993) (noting that, in the context of administrative notice-taking, the demands of due process ultimately depend on the circumstances). For example,
 
 
 24
 [i]t is not necessary to warn that administrative notice will be taken of the fact that water runs downhill. Some propositions, however, may require that notice not be taken, or that warning be given, or that rebuttal evidence be allowed. The agency's discretion must be exercised in such a way as to be fair in the circumstances.
 
 
 25
 Castillo-Villagra, 972 F.2d at 1028. Our disagreement with the BIA's action in this case has several facets.
 
 
 26
 First, we do not quarrel with the BIA taking administrative notice of the April 1990 election in Nicaragua, the formation of a non-Sandinista coalition government and Ms. Chamorro's inauguration as president. These facts are not subject to reasonable dispute and are easily verified. See id. at 1027. On the other hand, the BIA's conclusion that the Sandinistas were no longer in control is not so ineluctable. Unlike the objective facts of the results of an election, the political affiliation of elected or appointed officials and the inauguration of a president, what forces "control" a nation is in many instances an issue over which reasonable persons could disagree, particularly in countries where political conditions are volatile. There may very well be evidence that the coalition government does not enjoy full or even marginal control in Nicaragua and that the Sandinistas are still a force to be reckoned with.[1]
 
 
 27
 Second, the BIA failed to acknowledge that the persecution of which an applicant for asylum complains need not emanate from the present government of a foreign nation. "[T]he possible persecution to be established by an alien in order to be eligible for asylum may come from a non-government agency which the government is unwilling or unable to control." Bartesaghi-Lay v. INS, 9 F.3d 819, 822 (10th Cir.1993) (considering whether Peruvian alien had a well-founded fear of persecution arising from extra-governmental para-military group MRTA); see also McMullen v. INS, 658 F.2d 1312, 1315 n. 2 (9th Cir.1981) (reversing denial of asylum to Irish Catholic considered by paramilitary Irish Republican Army to be a traitor). The BIA did not consider whether the Sandinistas, now in opposition to the current government, constitute an agency that the government is unwilling or unable to control. Such a consideration, though essential in the present circumstances, does not lend itself well to the mechanism of administrative notice.
 
 
 28
 Third, we note that the paragraph containing the BIA's administratively noticed facts is nearly a verbatim copy of those employed in other cases. See, e.g., Gomez-Vigil v. INS, 990 F.2d 1111, 1112-13 (9th Cir.1993). With the exception of the first footnote (in which the BIA declined to address whether Petitioners had firmly resettled in Honduras), the BIA's decision contains no indication that it had undertaken a particularized consideration of Petitioners' case. Not only could its language apply to nearly any Nicaraguan alien seeking asylum, certain findings indicate the rote application of administrative notice to dismiss the appeal. Of particular interest is the finding that the new president of Nicaragua had declared "a general amnesty covering the hostilities between the former Contra resistance and the Nicaraguan government and an end to military conscription." R. at 3.
 
 
 29
 We question what relevance this has to Petitioner's situation. He did not claim to be a member of the Contras; therefore, a general amnesty between the new government and the Contras would have little bearing on his situation. Nor did his fear of persecution stem from any avoidance of military service with the Sandinistas. Instead, it emanated from threats the Sandinistas made because of the views he expressed while head of the cooperative and his reluctance to join other Sandinista organizations.
 
 
 30
 We agree with other courts that the BIA's disposition of cases in decisions "employing identical, 'boilerplate' paragraphs regarding the effect of the Nicaraguan election casts a cloud over the [BIA's] decisions and hinders meaningful judicial review." Rhoa-Zamora, 971 F.2d at 34. As noted in Kaczmarczyk v. INS:
 
 
 31
 The use of official notice does not substitute for an analysis of the facts of each applicant's individual circumstances. Uncontroverted facts may be inapplicable to or of limited probative value in individual cases and the Board must remain open to this possibility. The petitioners are therefore right to demand that the BIA engage in a careful, individualized review of the evidence presented in their applications and hearings.
 
 
 32
 933 F.2d 588, 594-95 (7th Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 583, 116 L.Ed.2d 608 (1991). Where consideration of a petitioner's appeal consists entirely of boilerplate, as here, the BIA's consideration can be considered "so deficient as to deny [the petitioner] due process." Rhoa-Zamora, 971 F.2d at 36.
 
 
 33
 Furthermore, the BIA failed to specify its reasons for concluding there were no humanitarian or other compelling factors to justify a discretionary grant of asylum had it found that the father had been persecuted in the past. See R. at 4. This, it seems, is abuse of discretion itself unless the reasons for the denial are articulated. See Cortes-Castillo v. INS, 997 F.2d 1199, 1203 (7th Cir.1993) ("The Board abuses its discretion when it fails to weigh important factors or neglects to state its reasons for denying relief.").
 
 
 34
 Finally, unlike Kapcia, Baka or the majority of other cases in which courts have upheld the BIA's administrative notice of a change in government,[2] the BIA's findings did not simply supplement those already made by the immigration judge. Here, the BIA reversed the immigration judge's finding that Petitioner had a well-founded fear of persecution based solely on the administratively noticed facts.
 
 
 35
 In these circumstances, the INS, not Petitioners, bears the burden of showing by a preponderance of the evidence that changed conditions since the time of the persecution no longer justify Petitioners' well-founded fear of being persecuted. See Gebremichael, 10 F.3d at 40-41; Dhine v. Slattery, 3 F.3d 613, 619 (2d Cir.1993). Because the administratively noticed facts constituted the sole evidence upon which the BIA relied to establish changed circumstances, advance notice and an opportunity to be heard on the significance of the political changes in Nicaragua was all the more crucial. See Ulloa v. INS, No. 91-3028, 1991 WL 181745 (6th Cir. Sept. 17, 1991); cf. Mattox v. Disciplinary Panel of U.S. District Court, 758 F.2d 1362, 1369 (10th Cir.1985) (holding that "due process requires that the court give notice and the reasons for its view before its decision is final, and give the applicant an opportunity to respond" when the court differs from the committee on conduct's view of applicant's character). But see Rivera-Cruz v. INS, 948 F.2d 962, 965 (5th Cir.1991).
 
 
 36
 The INS disputes that notice and an opportunity to be heard is required before the BIA may take administrative notice of a fact. It suggests that, although Fed.R.Evid. 201(e) and the Administrative Procedure Act (APA), 5 U.S.C. Sec. 556(e), provide that a party is entitled to notice and an opportunity to be heard on the propriety of taking judicial notice, the same is not true here because administrative notice is a broader concept than judicial notice and neither the Federal Rules nor the APA apply to the BIA. We disagree with the INS' reasoning.
 
 
 37
 The case upon which the INS relies, McLeod v. INS, does hold that administrative notice (referred to in that case as "official notice") is a "broader concept" than judicial notice, not because the procedural guarantees to a party are more limited but because the range of facts of which the BIA may take notice is wider. 802 F.2d at 93 n. 4. The notion that a party's due process rights in this context are any more limited before the BIA than they are before other administrative agencies or the courts is intolerable. See Gomez-Vigil v. INS, 990 F.2d at 1126 (Fletcher, J., concurring); Kaczmarczyk v. INS, 933 F.2d at 595-96.
 
 
 38
 In the circumstances of this case, where the BIA noticed facts and made disputable inferences based on those facts which not only directly contradicted the findings of the immigration judge but were dispositive of Petitioners' appeal, we hold that due process requires the BIA to give Petitioners advance notice and an opportunity to be heard. Whatever the ambit of "administrative notice," it is meant to facilitate fair and reasoned decision making and not to substitute for it.
 
 
 39
 The INS alternatively argues that Petitioners are given an adequate opportunity to rebut any administratively noticed facts because they may move for reopening of their case under BIA regulations, see 8 C.F.R. Secs. 3.2, 3.8. Courts are in wide disagreement on this question.[3] Many have held that the availability of reopening under BIA regulations vitiates an asylum applicant's claim that he is denied due process based on denial of notice and an opportunity to be heard. See, e.g., Rhoa-Zamora, 971 F.2d at 34; Gutierrez-Rogue, 954 F.2d at 773; Rivera-Cruz, 948 F.2d 962, 967, 968-69 (5th Cir.1991); Kaczmarczyk, 933 F.2d at 596-97.[4] These cases, however, contain little or no analysis of the limited protection afforded by a motion to reopen.
 
 
 40
 We believe the better analysis of this issue can be found in the Ninth Circuit's decision in Castillo-Villagra v. INS, 972 F.2d 1017, and its recent progeny, Acewicz v. INS, 984 F.2d 1056 (9th Cir.1993), Gomez-Vigil v. INS, 990 F.2d 1111, and Sarria-Sibaja v. INS, 990 F.2d 442 (9th Cir.1993). In Castillo-Villagra, the court followed the Seventh Circuit's decision in Kaczmarczyk by recognizing the BIA's power to take administrative notice of facts bearing on the petitioner's request for asylum and requiring that the petitioner be granted notice and an opportunity to rebut the facts so noticed. See 972 F.2d at 1029-30. The court, however, disagreed with the reasoning in Kaczmarczyk that the reopening procedures outlined in 8 C.F.R. Sec. 3.2 and Sec. 3.8 adequately protect an alien's due process rights, particularly because the BIA could deport the petitioner before considering the motion to reopen. Id. at 1030.
 
 
 41
 In Gomez-Vigil v. INS, the court explained in detail why the reopening procedures do not pass constitutional muster.
 
 
 42
 A Section 3.2 hearing cannot substitute for direct consideration on appeal. It was not designed to do so. First, the regulations explicitly state that motions to reopen "shall not be granted unless it appears that evidence sought to be offered is material and was not available and could not be discovered or presented at the former hearing. These motions must "state the new facts to be proved." The Supreme Court has made it abundantly clear that the threshold requirements for reopening may be strictly interpreted. Only new evidence, previously unavailable, or unforeseeable, and thus incapable of presentation to the IJ or the BIA on direct review justifies a reopening. Even then, higher standards are imposed. The Ninth Circuit employs a two-part test (endorsed by the Supreme Court) which requires that petitioners also "make a prima facie showing [of eligibility] for the relief sought." Lastly, as a functional matter, a reopening proceeding cannot take the place of direct review. "[M]otions to reopen are decided without a hearing and serve only a limited screening function." Where a claim requires a factual showing, one which may depend on live testimony or oral argument, our courts have found "the abbreviated procedure in a motion to reopen before the BIA is simply not a substitute."
 
 
 43
 990 F.2d at 1124 (Fletcher, J., concurring) (citations omitted); see also Gebremichael, 10 F.3d at 39 ("The motion to reopen process was clearly not designed as an opportunity to respond to officially noticed facts.").
 
 
 44
 In cases such as this one, where the BIA reverses the immigration judge's findings, the reopening procedure does not substitute for advance notice and an opportunity to rebut administratively noticed facts before the ruling is issued. See Ulloa, 1991 WL 181745 at * 1-* 2. The plain language of the regulations makes them inapplicable to motions to reopen based on information that was available and could have been presented at the time of the hearing. More to the point, petitioners are entitled to full review of the record on direct appeal; reopening is a matter in the BIA's discretion.
 
 
 45
 Finally, a petitioner is not guaranteed a stay of deportation while awaiting a decision on reopening. 8 C.F.R. Sec. 3.8(a). A petitioner's due process rights are not protected by a procedure that depends entirely on the good faith of the BIA. See Gebremichael, 10 F.3d at 40-41; Ulloa, 1991 WL 181745 at * 2 (motion to reopen "imposes the unreasonable risk that a petitioner may be deported before the Board considers the rebuttal evidence contained in his motion to reopen"); see, e.g. Castaneda-Suarez v. INS, 993 F.2d 142, 145 & n. 5 (7th Cir.1993) (INS declined to assure appellate court that petitioner would not be deported before consideration of his good-faith motion to reopen).
 
 
 46
 Consequently, we hold that the BIA denied the Petitioners due process by overturning the immigration judge's finding that Petitioners had a well-founded fear of persecution based solely on the administratively noticed facts, by failing to give their case individualized consideration and, more importantly, by not providing them with "the opportunity to be heard 'at a meaningful time and in a meaningful manner.' " Mathews v. Eldridge, 424 U.S. at 333, 96 S.Ct. at 902 (quoting Armstrong v. Manzo, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965)). For these reasons, we reverse the BIA's decision and remand for further proceedings that provide Petitioners with such an opportunity.
 
 
 47
 III. Firm Resettlement in Honduras.
 
 
 48
 Because the BIA ruled that Petitioners had no well-founded fear of persecution in Nicaragua, it declined to consider new evidence presented by Petitioners on appeal that they had not firmly resettled in Honduras. Under BIA regulations, an alien cannot be considered to have firmly resettled in another country unless he or she "entered into another nation with, or while in that nation received, an offer of permanent resident status, citizenship or some other type of permanent resettlement." 8 C.F.R. Sec. 208.15. The BIA should consider on remand whether the additional evidence introduced by Petitioners on appeal clarifying that Petitioner's legal residence in Honduras was temporary merits a conclusion that he and his family had not firmly resettled in Honduras.
 
 
 49
 Accordingly, the decision of the Board of Immigration Appeals dismissing Petitioners' appeal is REVERSED and the cause is REMANDED for further proceedings in accordance with this ruling.
 
 
 50
 PAUL KELLY Jr., Circuit Judge, dissenting.
 
 
 51
 I respectfully dissent because I am not persuaded that a motion to reopen is insufficient to protect Petitioners' right to challenge the application of administratively noticed facts. See Gebremichael v. INS, 10 F.3d 28, 38 (1st Cir.1993) ("We agree with the majority of those circuits which have addressed the question that the motion to reopen can ordinarily satisfy the demands of due process."); Kapcia v. INS, 944 F.2d 702, 706 n. 1 (10th Cir.1991) (recognizing motion to reopen as a way to present additional evidence in response to administratively noticed facts concerning a change in government). The deficiencies associated with a motion to reopen suggested by the court are speculative (we lack any decision on a motion to reopen before us) or wrong. We have reviewed the denial of motions to reopen and not only required the BIA to consider new evidence together with previous evidence, Turri v. INS, 997 F.2d 1306, 1311 (10th Cir.1993), but also required the INS to consider new evidence concerning persecution, Motamedi v. INS, 713 F.2d 575, 576-77 (10th Cir.1983). The existing procedure should be allowed to work; not having moved to reopen, Petitioners' claim is premature. Gutierrez-Rogue v. INS, 954 F.2d 769, 772-73 (D.C.Cir.1992); Rivera-Cruz v. INS, 948 F.2d 962, 968-69 (5th Cir.1991); Kaczmarczyk v. INS, 933 F.2d 588, 596-97 (7th Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 583, 116 L.Ed.2d 608 (1991). See also Gomez-Vigil v. INS, 990 F.2d 1111, 1120 (9th Cir.1993) (Aldisert, J., concurring); Rhoa-Zamora v. INS, 971 F.2d 26, 34-35 (7th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1943, 123 L.Ed.2d 649; --- U.S. ----, 113 S.Ct. 2331, 124 L.Ed.2d 243 (1993).
 
 
 
 *
 Honorable John L. Kane, Jr., Senior United States District Judge for the District of Colorado, sitting by designation
 
 
 [1]
 See, e.g., Gomez-Vigil v. INS, 990 F.2d 1111, 1115 (9th Cir.1993) (taking judicial notice of "accounts in leading newspapers stating that former Sandinistas control the Nicaraguan army and police forces"); Castillo-Villagra v. INS, 972 F.2d at 1030-31 (citing State Department country report for Nicaragua noting that the military and police remained under Sandinista control in 1990 despite the election of Chamorro and that numerous politically motivated killings continued to occur)
 In addition, the record in this case, which includes a New York Times article concerning the then-upcoming elections, casts doubt on the BIA's analysis of power in Nicaragua:
 Despite the criticisms of their opponents and public dismay with the state of Nicaragua today, few observers think the Sandinistas will lose or hand over power.
 President Ortega made that view explicit when he said in a speech two weeks ago that even if the Sandinistas were forced to give up formal control of the Government, they would never give up power.
 "It is foolish to believe the Sandinistas will voluntarily leave power," said a veteran Latin American diplomat here. "The best that can be hoped for is internal changes within the ruling party--the pressures today may force the emergence of a new form of Sandinism."
 (R. at 305.) We cite the above cases and record not as evidence that the BIA's decision was not supported by substantial evidence, which would be impermissible, see Gomez-Vigil, 990 F.2d at 1113, but as part of our consideration of whether the BIA properly exercised its discretion in taking administrative notice, see Castillo-Villagra, 972 F.2d at 1030 & n. 6; Rivera-Cruz v. INS, 948 F.2d 962, 967 n. 4 (5th Cir.1991).
 
 
 [2]
 Cases in which the appellate court has affirmed the BIA's decision upholding an immigration judge's denial of asylum for lack of a well-founded fear of persecution include Mustafa v. INS, No. 92-2247, 1993 WL 347441 at * 1 (4th Cir. Sept. 7, 1993); Tokarska v. INS, 978 F.2d 1, 1 (1st Cir.1992); Rhoa-Zamora v. INS, 971 F.2d at 29; Gutierrez-Rogue v. INS, 954 F.2d at 771; Wojcik v. INS, 951 F.2d 172, 172-73 (8th Cir.1991); Janusiak v. INS, 947 F.2d 46, 47 (3d Cir.1991); Kaczmarczyk v. INS, 933 F.2d at 591; and Kubon v. INS, 913 F.2d 386, 387 (7th Cir.1990)
 
 
 [3]
 We did not address this issue in Kapcia or Baka. As to petitioners' argument in Kapcia that they were denied due process because they did not have an opportunity to rebut the inference, we stated:
 On the contrary, petitioners had ample opportunity to address those issues.... The record reveals petitioners enjoyed a fair hearing on this issue. Administrative notice of the changed conditions in Poland was first taken during the deportation hearings before the immigration judge. Petitioners' efforts at these earlier hearings were mainly aimed at the contention that despite the new coalition government, they still faced persecution if returned to Poland. Both presented extensive expert witness testimony to that end. Consequently, petitioners were well aware of that issue prior to their appeal hearings before the Board.
 944 F.2d at 705-06. Thus, because the petitioners had an adequate opportunity to address the significance of Solidarity's participation in government at their hearings before the immigration judge, they were not denied due process. The petitioners in Baka did not argue they were denied due process. See 963 F.2d at 1378.
 
 
 [4]
 Others have simply approved of the procedure without express consideration of the due process issue. See, e.g., Mustafa v. INS, 1993 WL 347441 at * 2; Tokarska v. INS, 978 F.2d at 1-2; Wojcik v. INS, 951 F.2d at 173; Janusiak v. INS, 947 F.2d at 48 n. 1; Kubon v. INS, 913 F.2d at 388