**Qun YANG, Petitioner–Appellant,**

v.

**Edward J. MCELROY, District Director for the United States Immigration and Naturalization Service; Anthony Moscato, Director of the Executive**

Office for Immigration Review; Paul W. Schmidt, Chairman of the Board of Immigration Appeals, Respondents–Appellees.

Docket No. 98–4391.

United States Court of Appeals, Second Circuit.

Argued: Oct. 30, 2001.

Decided: Jan. 7, 2002.

Craig Wilson, Wilson & Associates, P.C., "Charles Christophe, on the brief", New York, NY, Attorneys for Petitioner–Appellant.

Sean H. Lane, Assistant United States Attorney, "John Ashcroft, United States Attorney General, Mary Jo White, United States Attorney, Kathy S. Marks, Jeffrey S. Oestericher, Assistant United States Attorneys, on the brief", for Respondents–Appellees.

Before: McLAUGHLIN and POOLER, Circuit Judges, SAND, District Judge.*

PER CURIAM.

This is a petition for review of a decision of the Board of Immigration Appeals ("BIA" or "Board") denying appellant Qun Yang's applications for political asylum. Appellant maintains that the BIA erred when it affirmed the Immigration Judge's ("IJ") finding that he had not sustained his burden of showing a well-founded fear that he would be subject to persecution in the People's Republic of China ("China") because of his political and other actions taken before and after his illegal departure from China to the United States. We have jurisdiction to consider the petition under 8 U.S.C. § 1105a.[1]

## I. FACTS

Appellant, a citizen of China, attempted to enter the United States illegally in the Spring of 1993. Upon being promptly detained at John F. Kennedy International Airport, Yang was served with a notice charging that he was subject to exclusion pursuant to the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1182(a) (1994). On June 3, 1993, appellant requested political asylum and at hearings held on July 27, 1993 and January 18, 1994, an IJ heard evidence regarding his request. In the course of the hearing, Yang reported the history of his political activities in China and in the United States as well as the negative repercussions such activities engendered.

Specifically, Yang described a period during his studies at the Lian Giang secondary school during the Spring of 1989 (immediately prior to the events at Tiananmen Square) where he organized and led pro-democracy protests in the Fujian province. Appellant explained that he encouraged approximately one hundred students to attend pro-democracy protests at Fuzhou University on May 4, 1989 and led others in protest outside a government building on May 16, and May 24, 1989. At these protests, appellant shouted slogans and held up posters in support of democracy. Further, appellant testified that he helped collect money to fund the student protests in Beijing from the Qingzi High

---

* The Honorable Leonard B. Sand, United States District Judge for the Southern District of New York, sitting by designation.

1. The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub.L. No. 104–208, 110 Stat. 3009 (1996), signed into law on September 30, 1996, repealed this provision. However, because Yang was in deportation proceedings prior to the April 1, 1997 effective date of the Act, the IIRIRA does not apply to Yang's petition for review and § 1105a continues to be the relevant standard of review. *Zhao v. Reno*, 265 F.3d 83, 89 (2d Cir.2001).

School on April 29, 1989 and from another school on June 4, 1989.

As a consequence of such actions, appellant's school requested that he make a confession at a denouncing meeting held at the conclusion of the spring semester in 1989. Appellant refused to do so and on September 4, 1989 was discharged from school. The notice of discharge stated that appellant had violated school rules by participating in democracy protests, had a record of absenteeism related to these protests (the report indicated that appellant had missed 157 consecutive classes), and had associated with outsiders. Following his discharge from school, appellant spent two weeks at his parents' house and then left for the city of Fuzhou. Two weeks later, appellant learned that the Public Security Bureau had visited his house and ordered him to report to the Bureau within two weeks. Appellant did not comply and, instead, remained in Fuzhou for three and a half years until February 1993. During this time, appellant worked in a private refrigerator factory. Appellant testified that due to fear of government authorities, he worked under an alias and did not return to his parents' house. He did, however, call his family by public telephone one or two times a month during this period.

In March 1993, appellant left China illegally, passing through Singapore and Korea prior to his arrival in United States in May 1993.[2] In October 1993, during the pendency of his asylum request, Yang joined the Chinese Alliance for Democracy ("CAD"). As a member of the CAD, Yang participated in a demonstration in front of the Chinese Consul during which he again held up posters and shouted slogans in support of democracy. Appellant also published an article in the Oriental News on December 13, 1993 critical of the Communist Party in China.

In an oral opinion rendered on January 18, 1994 following Yang's testimony, the IJ denied Yang's application for asylum and withholding of deportation. On November 25, 1998, the BIA affirmed the IJ's decision. The BIA agreed with the IJ that appellant's discharge from school and the Public Service Bureau's subsequent investigation of him did not amount to past persecution. Further, relying largely on the Department of State's 1993 Country Report (and declining to consider the dissenting judge's reference to a more recent Country Report), the BIA affirmed the IJ's finding that appellant's fear of future persecution in China was not objectively reasonable.

The Immigration and Naturalization Service ("INS") although primarily urging affirmance of the Board's decision to deny asylum, suggested in its brief to this Court, as it did in *Asani v. INS*, 154 F.3d 719 (7th Cir.1998), that the proper route for appellant to follow is to seek further review of his asylum application based on changed circumstances in China. In *Asani*, the Seventh Circuit ordered a limited remand to enable appellant to pursue this remedy by filing a motion for such review while the court retained jurisdiction. 154 F.3d at 726. We agree that this procedure is the preferable means to proceed. This procedure will enable preservation of the status quo (*i.e.* preclude deportation pending resolution of these procedures). For the reasons stated herein, we order such limited remand.

---

**2.** "Under Article 176 of the Chinese Criminal Code, a person violating the exit laws may receive a sentence of up to one-year imprisonment." Bureau of Democracy, Human Rights, and Labor, Department of State, *China Profile of Asylum Claims and Country Conditions* at 9 (November 9, 1993).

## II. DISCUSSION

The majority of the Board predicated its conclusion that appellant has not sustained his burden of showing well-founded grounds for fearing persecution if deported to China by primarily relying on a 1993 State Department Country report, rejecting the dissenting judge's reference to events in 1998 as being outside the administrative record.

The recurring problem of the significant time gaps between the operative events, Board determination, and appellate review, has been considered by several circuits but has not yet been fully addressed by the Second Circuit. Some courts have strictly adhered to the record before the Board. *E.g., Sivaainkaran v. INS,* 972 F.2d 161, 165–66 (7th Cir.1992) (affirming the BIA's decision and signaling to applicant that proper recourse is to file a motion to reopen); *Chavarria v. United States Department of Justice,* 722 F.2d 666, 669 (11th Cir.1984) (finding that in review of asylum denial, court cannot consider allegations that conditions have changed in the applicant's country; proper remedy is for the applicant to file a motion to reopen). Other courts have themselves taken judicial notice of changed circumstances. *E.g., Dobrota v. INS,* 195 F.3d 970, 973 (7th Cir.1999) (taking judicial notice of most recent report on Romania *sua sponte* as current conditions in the country were "crucial" to the court's decision); *Ivezaj v. INS,* 84 F.3d 215, 218–19 (6th Cir.1996) (taking judicial notice of persecution of Albanians by Serbs in the former Yugoslavia). The BIA itself has on occasion noted *sua sponte* changed conditions in the country to which the alien would be deported as a grounds for denial of asylum, *Kaczmarczyk v. INS,* 933 F.2d 588, 594–95

(7th Cir.1991), but appears not to have done so as a grounds for granting this relief.

▇▇▇ The third, and we believe preferable procedure is that suggested by the INS to the Seventh Circuit in *Asani,* 154 F.3d at 725–26 & n. 3 as well as to this Court. Remand to the Board recognizes that the Board is the adjudicative body having primary responsibility and experience in asylum matters. This procedure recognizes that the IJ whose decision the Board reviews, unlike an Article III judge, is not merely the fact finder and adjudicator but also has an obligation to establish the record. 8 U.S.C. § 1229a (b)(1) ("The immigration judge shall administer oaths, receive evidence, and interrogate, examine, and cross-examine the alien and any witnesses."); United Nations *Handbook on Procedures & Criteria for Determining Refugee Status:* Office of the United Nation's High Commissioner for Refugees, para. 196; 205(b)(i) (1979) (stating that the asylum statute contemplates that "the duty to ascertain and evaluate all the relevant facts is shared between the applicant and examiner" and that the asylum adjudicator must "ensure that the applicant presents his case as fully as possible and with all available evidence"); *see also Richardson v. Perales,* 402 U.S. 389, 410, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (finding that an administrative law judge "acts as an examiner charged with developing the facts"); Charles H. Koch, Jr., Administrative Law and Practice § 5.25 (2d ed. 1997) (noting that "[t]he presiding official is pivotal to the factfinding function of an evidentiary hearing and hence, unlike the trial judge, an administrative judge has a well established affirmative duty to develop the record.").[3]

---

**3.** We have enforced this principle consistently in the non-adversarial context of social securi-

ty cases, *e.g., Shaw v. Chater,* 221 F.3d 126, 131 (2d Cir.2000) (administrative law judge

■ The BIA in 1998 affirmed a 1994 decision of the IJ predicated primarily on a 1993 State Department Country Report. But current country conditions "bear vitally" as to asylum, *Osmani v. INS,* 14 F.3d 13, 14 (7th Cir.1994) and because the administrative record is silent as to China's contemporary treatment of persons with backgrounds similar to Yang's, we agree with the INS that remand is appropriate in this case.[4]

Remand to the BIA will enable it to address several respects in which the present record appears deficient.

First, as noted, there is the significant time gap between the 1993 State Department Country Report and the time of the proposed deportation. It is, of course, possible that China's attitude and treatment of returned alleged dissidents has not altered in the past eight years, but the consequences of deportation are simply too grave to leave this solely to surmise.

■ We recognize, as the INS urges, that the burden of proof rests with the applicant for asylum, but a burden of production rests with the INS. The INS not only has this burden but also has greater access than does the alien—even an alien represented by counsel, *see supra,* n. 3—to State Department documents and other sources of current data. *See* Fleming

James, Jr., et al., Civil Procedure § 7.16, at 344 (4th ed. 1992)(noting that while not "controlling" that "the burden of proof traditionally is placed on the party having the readiest access to knowledge about the fact in question."). Of course, the applicant through his counsel should present to the BIA relevant material available to him, but the burden should not fall solely on the applicant whose resources may often be quite limited.

■ Second, remand will enable fuller consideration to be given to the totality of appellant's conduct as it will be perceived by the Chinese authorities if he is returned to their shores. It is not adequate to examine in isolation each of appellant's actions (*i.e.,* his pro-democracy student activism, his refusal to engage in self-renunciation, his illegal departure from China,[5] and his membership and participation in an anti-Chinese government organization in the United States) and to ask how the Chinese Government reacts to each of these activities viewed separately. *Cordero–Trejo v. INS,* 40 F.3d 482, 487 (1st Cir.1994) (finding that "deference is not due" to immigration agency "where findings and conclusions are based on inferences or presumptions that are not reasonably grounded in the record, viewed as a whole"); *cf. Landess v. Weinberger,* 490 F.2d 1187, 1190 (8th Cir.1974) (finding

has an affirmative obligation to develop administrative record regardless of whether applicant is represented by an attorney); *Perez v. Chater,* 77 F.3d 41, 47 (2d Cir.1996); *Echevarria v. Sec'y of Health and Human Servs.,* 685 F.2d 751, 755 (2d Cir.1982), but have not addressed the affirmative duties of the IJ to develop the record. The Ninth Circuit, however, in its most recent treatment of the issue has found the duty of the immigration judge "analogous to that of an administrative law judge in [a] social security [hearing]" and held that immigration judges must also fully develop the record in asylum proceedings if parties are unrepresented by counsel. *Jacinto v. INS,* 208 F.3d 725, 732–33 (9th Cir.2000).

4. It is well-settled that the BIA has the authority to take administrative notice of current events bearing on an applicant's wellfounded fear of persecution. *E.g., Meghani v. INS,* 236 F.3d 843, 847–48 (7th Cir.2001); *de la Llana–Castellon v. INS,* 16 F.3d 1093, 1095–96 (10th Cir.1994).

5. Possible persecution for violation of a statute applicable to all citizens would not standing alone constitute a valid basis for asylum but is a factor to be considered in assessing the totality of Yang's circumstances.

that fair evaluation of social security claim requires the secretary to "view the individual as a whole" alongside the totality of the disability). To the contrary, the BIA must evaluate appellant's actions and experiences in the aggregate in order to determine whether the totality of the circumstances support denial of an asylum request.

We reserve jurisdiction and remand to the BIA for the limited purpose of entertaining and resolving a motion by applicant to consider whether circumstances in China since 1993 have so changed that he has a well-founded fear that, given the totality of his actions, he would be subject to persecution if deported to China.[6]

---

**6.** As indicated *supra,* in its brief to this Court the INS favorably referred to the procedure adopted in *Asani* (i.e., reservation of jurisdiction by the Court of Appeals and a limited remand) and counsel stated at oral argument on October 30, 2001 that the INS would advise if it was agreeable to proceeding in this fashion. On December 5, 2001, there was submitted without covering letter or other exposition a stipulation signed by parties providing for the limited remand but also stating that the petition "is hereby withdrawn with prejudice." This phrasing may be viewed as inconsistent with the procedure in *Asani* which we adopt here. Accordingly, we have not "so ordered" the proffered stipulation.