

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-12-2001

# Abdulai v. Ashcroft

Precedential or Non-Precedential:

Docket 00-3111

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Abdulai v. Ashcroft" (2001). *2001 Decisions.* Paper 26.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/26

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed February 12, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-3111

OLUFEMI YUSSEF ABDULAI, Petitioner

v.

JOHN ASHCROFT,* ATTORNEY GENERAL OF
THE UNITED STATES, Respondent

On Petition for Review of an Order of the
Board of Immigration Appeals
(Agency No. A 75 809 064)

Argued: December 19, 2000

Before: BECKER, Chief Judge, NYGAARD and
FUENTES, Circuit Judges.

(Filed February 12, 2001)

      MEAGHAN E. TUCHEY-KAY,
       ESQUIRE (ARGUED)
      Catholic Legal Immigration Network,
       Inc., (CLINIC)
      976 Broad Street
      Newark, NJ 07102

Counsel for Petitioner

_____

* Substituted for Janet Reno pursuant to Federal Rule of Appellate
Procedure 43(c).

DAVID W. OGDEN, ESQUIRE
Assistant Attorney General
CARL H. McINTYRE, JR., ESQUIRE
Senior Litigation Counsel
MARSHALL TAMOR GOLDING,
 ESQUIRE (ARGUED)
JOHN D. WILLIAMS, ESQUIRE
TERRI J. SCADRON, ESQUIRE
Office of Immigration Litigation
Civil Division
United States Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC 20044

Counsel for Respondent

RICHARD W. HILL, ESQUIRE
BRENDA C. LISS, ESQUIRE
  (ARGUED)
ANTHONY F. YACULLO, ESQUIRE
McCarter & English, LLP
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102

Counsel for Amicus Curiae,
The Lawyers Committee for
Human Rights

OPINION OF THE COURT

BECKER, Chief Judge.

Olufemi Yussef Abdulai, a Nigerian national, petitions for review of a decision by the Board of Immigration Appeals (BIA or Board) ordering him removed to his home country. His petition presents the important question whether the BIA may, consistent with existing law, sometimes r equire otherwise-credible applicants for asylum or withholding of removal to present evidence corroborating their stories in order to meet their burden of proof. Abdulai contends that it may not, but we conclude that it may.

We begin by clarifying that, absent special circumstances not present here, we review only decisions by the BIA and not those by immigration judges. We then explain why we reject Abdulai's other main argument--that the Board deprived him of due process of law by failing to conduct a sufficiently individualized assessment of his claim. Turning to the heart of the appeal, we explain why an examination of the Immigration and Nationality Act (INA), the INA's implementing regulations, the United States' obligations under international law, and our own pr ecedent leads us to conclude that the BIA may sometimes requir e corroboration of otherwise-credible testimony. Despite this holding, because there is a serious question whether the Board's own rules were properly applied in this case, we vacate the BIA's order and remand this matter to per mit the Board to explain: (1) what aspects of Abdulai's narrative it would have been reasonable to expect him to corr oborate; (2) why the evidence he submitted failed to do so; and (3) why Abdulai's explanations of why he could not corr oborate certain aspects of his account were insufficient.

I.

A. Procedural History

Abdulai arrived at New York's JFK airport in the spring of 1998. Lacking a valid entry visa, he was taken into custody by the Immigration and Naturalization Service (INS or Service). Shortly thereafter, the INS commenced a proceeding to allow it to remove Abdulai from the United States. At an initial hearing Abdulai conceded that he was "removable," i.e., that he was not entitled to remain in the United States absent some form of relief by the INS, but represented that he would be seeking both asylum from and withholding of removal to Nigeria based on political persecution. The case was continued to allow Abdulai to file the appropriate papers, which he timely did.

A grant of asylum allows an otherwise-removable alien to stay in the United States. Subject to numerous exceptions not implicated in this case, the Attorney General "may grant asylum" to an alien he "determines" to be a "refugee"

within the meaning of the INA. 8 U.S.C. S 1158(b)(1). As relevant to this case, a person is a "r efugee" if he or she is "unable or unwilling" to return home "because of persecution or a well-founded fear of persecution on account of . . . political opinion." Id.S 1101(42)(A). Withholding of removal, in contrast, confers only the right not to be deported to a particular country--not a right to remain in this one. See INS v. Aguirr e-Aguirre, 526 U.S. 415, 419 (1999). Also subject to many exceptions not applicable here, the Attorney General may not remove an alien to a particular country if he "decides" that the alien's "life or freedom would be threatened in that country because of the alien's . . . political opinion." 8 U.S.C. S 1231(b)(3)(A).

An Immigration Judge (IJ) conducted a hearing concerning Abdulai's application. Abdulai testified on his own behalf and offered documentary evidence describing conditions in Nigeria in support of his claim. At the close of the hearing, the IJ rendered an oral decision denying Abdulai's application and ordering him r emoved. The IJ did not expressly find that Abdulai's testimony lacked credibility, but nevertheless concluded that he had "not presented adequate evidence to demonstrate" eligibility for asylum or withholding of removal. The IJ also noted that General Sani Abacha--who had ruled Nigeria since seizing power in a coup in 1993--had died just four days before the hearing, and that "an issue of changed country conditions" had arisen as a result. Referring to the fact that "there have been some political changes in Nigeria," the IJ nevertheless determined that it was "much too premature to conclude that . . . the political atmosphere has changed in Nigeria so that a person who has a credible fear of returning to Nigeria would no longer have such fear."

Abdulai then appealed to the BIA, which received a transcript of the hearing and a brief from Abdulai. The Board ultimately remanded the case to the IJ. Noting the recent changes in the Nigerian government, the BIA stated that "the record does not contain infor mation from which the Board would have been able to glean the import of the changes on [Abdulai's] claim." Accor dingly, the BIA ordered "the record . . . remanded to the Immigration Court so that

4

both parties . . . may have an opportunity to pr offer any evidence relevant to the applicant's claim and for the entry of a new decision by the Immigration Judge." The BIA also ordered that "[s]hould a decision on remand be adverse to the respondent, the record shall be certified to the Board for review."

Consistent with the BIA's direction, the IJ then held another hearing. A witness for Abdulai testified that any changes in Nigeria following the death of General Abacha were nothing more than cosmetic dif ferences between it and the former government. Both Abdulai and the INS submitted documentary evidence about the transfer of power in Nigeria. The IJ again denied Abdulai's application by a written decision, reasoning that even if she were "to accept all of the [new] evidence presented by [Abdulai] in the worst possible light, [Abdulai] has submitted no evidence of any sort which relates to this Court's previous finding that [he] has not met his bur den of proof and persuasion do [sic] to the inadequacy of his testimony." Accordingly, the IJ once again found that Abdulai had "failed to meet the burden of proof and persuasion" and denied him both asylum and withholding of removal. The IJ also stated that she would "certify the r ecord to the BIA for review." Abdulai claims that he was not per mitted to submit an additional brief to the BIA, and it appears that no transcript of the February 24, 1999 hearing was ever prepared. The BIA denied Abdulai's r equest for oral argument.

On January 18, 2000, the BIA entered a final order denying Abdulai's application, which was accompanied by a two-page per curiam opinion. The opinion noted that the IJ had denied Abdulai's application "primarily based on [his] failure to articulate a specific and detailed claim," and noted that on remand Abdulai had "pr ovided only general information as to the political situation in Nigeria, but again failed to demonstrate how he is adversely af fected by the change of government in Nigeria." Then, summarizing several of its previous decisions, the Boar d laid out the following rules: (1) an asylum seeker must always pr esent "general background information on country conditions;" and (2) "where it is reasonable to expect corroborating

5

evidence for certain alleged facts pertaining to the specifics of an applicant's claim, such information should be provided . . . [or] an explanation should be given as to why such information was not provided." The BIA stressed that the absence of corroboration or explanation in cases where it is reasonable to expect one or the other "can lead to a finding that the applicant has failed to meet his burden of proof."

The Board's application of these principles to Abdulai's case was terse. It stated:

> [W]e find that the respondent has not provided sufficient evidence to meet his burden of pr oof. We acknowledge that the respondent has submitted numerous articles and reports regar ding general country conditions in Nigeria. However, we note the conspicuous lack of documentary evidence corroborating the specifics of the respondent's testimony. Therefore, given the complete lack of evidence corroborating the specifics of the r espondent's asylum claim, we agree with the Immigration Judge that the respondent has failed to sustain his burden of proof in this matter.

Board Member Rosenberg dissented. She ar gued that Abdulai had "provided consistent, specific and detailed testimony, which establishe[d] that he pr eviously suffered" persecution "at the hands of the Nigerian authorities on account of his political opinion." Rosenber g also averred that the IJ had "misassessed the evidence factually when she concluded that [Abdulai's] testimony lacked specificity," and reasoned that the IJ had "applied an inappropriate legal standard in justifying her finding that [Abdulai] had not presented adequate evidence [i.e., the corroboration requirement]." Rosenberg also took issue with the manner in which the Board had dealt with Abdulai's case. She stated:

> The fact remains that we never have engaged in review of the respondent's . . . original appeal in a manner that can be described as meaningful. Rather, in denying the instant appeal, the majority, in a cursory per curiam decision, simply affirms the Immigration

6

Judge's original decision. The majority opinion does not reflect that it meaningfully reviewed the decisions of the Immigration Judge in relation to the r ecord, or that it addressed the respondent's original appellate arguments, or those made in connection with the Immigration Judge's subsequent decision following our remand order. In my view, the majority now sidesteps our responsibility to conduct meaningful appellate review by simply affirming the Immigration Judge's decision without considering the record, de novo, or, at the very least, addressing the arguments made by the respondent in his original appeal.

Abdulai timely filed a petition for review with this Court. We have jurisdiction pursuant to 8 U.S.C.S 1252(a).

B. Abdulai's Account and His Supporting Evidence 1

On June 12, 1993, Nigerians voted in a presidential election. Despite the fact that Chief M.K.O. Abiola seems to have won, the results were annulled when General Abacha seized power in a coup. Abdulai--who had lived and worked in and around Lagos, Nigeria for his entir e life--was outraged by the coup. In November 1993 he joined and attended his first meeting of the Campaign for Democracy (CD), an organization seeking to restor e Nigeria to civilian rule. At some point he was issued a CD membership card.

Abdulai did not attend another CD meeting, however , until February 1995. Abdulai provided no r eason for this fourteen month gap--a fact stressed by the IJ--nor did he explain what caused him to attend the February 1995 meeting. At that meeting, a large number of activists gathered at the home of a CD organizer . The meeting was raided by Nigerian police officers, and Abdulai was arrested along with the president of the organization and other prominent CD members. He was imprisoned in a communal cell, but was never charged with an of fense, questioned by the police, or permitted to speak with anyone on the outside. After approximately two weeks, he was released without explanation.

_____

1. Unless otherwise stated, the details of Abdulai's story are uncorroborated.

7

Abdulai resolved to become more involved with the CD. He attended another meeting in March 1995, wher e he volunteered to be a "Strategic Planner ." Strategic Planners distribute pamphlets, hang posters, and "generally mak[e] people aware" of CD's activities. Then, on June 12, 1995, Abdulai participated in a rally held to commemorate the two year anniversary of the 1993 elections. The police arrived, fired tear gas into the crowd, and arrested Abdulai while he was handing out pamphlets. He did not know how many people had been at the June 12 rally, nor did he know how many people had been arrested that day. During his second stint in prison, Abdulai was told that he was being confined pursuant to Decree Number Two of 1984, and that he would be charged with distributing seditious materials and unlawful gathering. The guards also took his CD membership card. Two months later, Abdulai was released when his family succeeded in bribing his captors.

After his release, Abdulai's family convinced him to drop out of the CD because they feared for his safety. He stopped attending CD meetings, abandoned his position as a Strategic Planner, and destroyed all his CD materials. Nevertheless, in June 1996, Abdulai was again taken into custody, this time by the Nigerian State Security Services. He was questioned for several hours about an upcoming CD rally, and placed in a cell. He was questioned three additional times over a four month period and then released.

Abdulai was arrested a final time in either late November or early December of 1996 by agents of the Dir ectorate of Military Intelligence. The agents ransacked his apartment and took him to their barracks. Abdulai was questioned about an explosion in Lagos and his relationship to other activists, but told the officers that he was no longer a member of the CD. During the questioning, officers slapped Abdulai and "stomped on his ear." He was then placed in a cell. Abdulai was later told that he would be r eleased if he signed a document incriminating other activists. He signed the document, after which his conditions of confinement improved.

Abdulai fell ill sometime around March 1997 and was released in May of that year. After being treated by a doctor,

he fled to Benin. He stayed there until Mar ch 1998, when several of his friends who had traveled to Nigeria to participate in a rally were arrested. Abdulai became convinced that the Nigerian police now knew his whereabouts (and, presumably, that they would hunt him down in Benin). A friend arranged for him to be smuggled from Benin to Togo to Ghana to the Ivory Coast, and, finally, to the United States.

Abdulai tendered a considerable amount of documentary evidence in support of his account. In addition to a large amount of background material concerning conditions in Nigeria, he also submitted: (1) his Nigerian passport; (2) a letter from the General Counsel of the National Democratic Council, an umbrella organization supporting democracy in Nigeria, which stated that his story "appear[ed] very credible in relation to the types of cases we are aware of " but that "[b]ecause of the massive clamp-down on civil society in Nigeria, efforts to independently verify or confirm membership [in pro-democracy groups] are usually fruitless from this end and dangerous from the Nigerian end;" and (3) an affidavit from an assistant pr ofessor of African Studies and Politics who had visited Nigeria and written about the political situation there. The pr ofessor opined that Abdulai's account was "consistent with the current political conditions in Nigeria."

II.

We must first clarify whether we review only the decisions of the BIA or those of both the IJ and the BIA. Though this Court appears never to have spoken on this pr ecise issue, there is widespread consensus among our sister circuits. Congress has granted us power to review only "final order[s] of removal." 8 U.S.C. S 1252(a)(1). Because an alien facing removal may appeal to the BIA as of right, and because the BIA has the power to conduct a de novo r eview of IJ decisions, there is no "final order" until the BIA acts. See Castillo-Rodriguez v. INS, 929 F.2d 181, 183 (5th Cir. 1991). Accordingly, we now expressly hold that the "final order" we review is that of the BIA. Accord 3 Charles Gordon et al.,

9

Immigration Law & Procedure P 34.02[14][a], at 34-61 (2000).2

III.

Abdulai contends that the BIA denied him due pr ocess by failing to make an individualized determination of his interests. He specifically faults the Boar d for not acknowledging or addressing any of his ar guments.3

Despite the fact that there is no constitutional right to asylum, aliens facing removal are entitled to due process. See Sewak v. INS, 900 F.2d 667, 671 (3d Cir. 1990). "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." Matthews v. Eldridge, 424 U.S. 319, 333 (1976)

_____

2. There are some situations in which a court of appeals effectively reviews an IJ's decision, but this is not one of them. The vast majority of the courts of appeals have held that the BIA"may simply state that it affirms the IJ's decision for the r easons set forth in that decision." Chen v. INS, 87 F.3d 5, 7 (1st Cir . 1996) (citing cases from the Second, Fourth, Fifth, Seventh, Eighth, Tenth, and Eleventh Circuits). In such cases, the IJ's opinion effectively becomes the BIA's, and, accordingly, a court must review the IJ's decision. See id . at 7 n.3. The BIA may disregard an IJ's factual findings and conduct a de novo review of the entire record, but it is also entitled to defer to an IJ's fact-finding (assuming, of course, that the IJ's conclusions ar e supported by the evidence). See Senathirajah v. INS, 157 F .3d 210, 216 (3d Cir. 1998). When the BIA defers to an IJ, a reviewing court must, as a matter of logic, review the IJ's decision to assess whether the BIA's decision to defer was appropriate. In this case, the BIA never expressly "adopted" any portion of the IJ's opinion or announced that it was deferring to any of the IJ's findings. We therefor e review only the BIA's decision.

3. Abdulai also claims that the BIA was r equired to conduct a de novo review of the entire record. W e find this claim meritless. First, we have squarely held that the BIA may defer to an IJ's factual findings. See Senathirajah v. INS, 157 F.3d 210, 216 (3d Cir. 1998). In such cases, the BIA obviously does not review de novo. Second, the case on which Abdulai relies, Charlesworth v. USINS, 966 F.2d 1323 (9th Cir. 1992), simply does not support his argument. Charlesworth stated that the BIA "has the power to conduct a de novo review of the record." Id. at 1325 (emphasis added) (quotation marks and citation omitted). Having the power to do something and being required to do it are not the same thing.

10

(quotation marks and citation omitted). In adjudicative contexts such as this one, due process r equires three things. An alien: (1) is entitled to "factfinding based on a record produced before the decisionmaker and disclosed to" him or her, Llana-Castellon v. INS, 16 F.3d 1093, 1096 (10th Cir. 1994); (2) must be allowed to make arguments on his or her own behalf, see id.; and (3) has the right to "an individualized determination of his [or her] interests," id. (citing Rhoa-Zamora v. INS, 971 F.2d 26, 34 (7th Cir. 1992)). Because Abdulai does not contend that the decision to exclude him was based on evidence that was kept secret from him, or that he was prevented fr om making his case to the BIA or the IJ, the only due process right potentially implicated in this case is the third one--the right to an "individualized determination."4

A decisionmaker must "actually consider the evidence and argument that a party presents." Id. This Court has suggested that the BIA denies due process to an alien when it "act[s] as a mere rubber-stamp." Marincas v. Lewis, 92 F.3d 195, 202 n.7 (3d Cir. 1996). But because "[a]gency action . . . is entitled to a presumption of r egularity," Abdulai bears the burden of proving that"the BIA did not review the record when it consider ed the appeal." McLeod v. INS, 802 F.2d 89, 95 n.8 (3d Cir. 1986).

We are troubled by certain aspects of this case. It appears that no record of the February 24, 1999 remand hearing was ever transmitted to the Board. 5 Moreover, though the BIA faulted Abdulai for not submitting"evidence

_____

4. Though Abdulai complains that he was not allowed to file an additional brief with the BIA following the r emand, he concedes that he submitted one during his first appeal to that body. Because the Board's decision was based on Abdulai's failure to corr oborate the specifics of his
story, and because Abdulai concedes that no evidence going to that issue was presented at the remand hearing, we conclude that the BIA's refusal to allow him to submit an additional brief worked no due process violation.

5. The BIA denied Abdulai's application because he had failed to corroborate the specifics of his narrative. Because he concedes that none of the evidence presented at the remand hearing qualified as such corroboration, we conclude that the failur e to include the evidence in the
administrative record, though error , was harmless.

11

corroborating the specifics of [his] testimony," it failed to acknowledge or respond to Abdulai's arguments that he had corroborated certain portions of his testimony and that it was unreasonable to expect him to corroborate others.

That being said, the question for due process purposes is not whether the BIA reached the correct decision; rather, it is simply whether the Board made an individualized determination of Abdulai's interests, and we believe that its opinion contains sufficient indicia that it did so. The BIA stated that: "This matter was remanded to the Immigration Judge for further inquiry as to the changed country conditions of Nigeria, particularly since the government that ruled in Nigeria at the time the respondent alleges he suffered persecution was no longer in power." It then noted that: "The Immigration Judge found that the respondent only provided a large amount of evidence concerning general claims as to the unrest in Nigeria, but failed to include evidence specific to his claim, such as evidence of his membership in a political party." The BIA further observed that: "[O]n remand, the respondent provided only general information about the political situation in Nigeria, but again failed to demonstrate how he is adversely affected by the change in government in Nigeria."

From these statements, one can deduce that the BIA was aware that Abdulai was a Nigerian seeking asylum on the basis of political persecution, that there had been issues involving a change in the Nigerian government and his failure to document his membership in a political party, and that the IJ's decision evinced dissatisfaction with his meeting the requisite burden of proof. This is sufficient. See, e.g., Rhoa-Zamora, 971 F.2d at 35-36 (finding no due process violation in a case where the BIA had noted that the applicant's " `testimony concerning the military round-up of young males, like himself, in Nicaragua,' " and had made "an explicit finding that [two particular State Department Reports] which [the applicant] claimed that the Immigration Judge improperly prevented him from submitting, `do not establish his present eligibility for either withholding of deportation or asylum.' " (quoting the BIA)).

The instant matter is distinguishable from the only immigration case Abdulai cites in which a court found a

12

due process violation: the Tenth Cir cuit's decision in Llana–Castellon v. INS, 16 F.3d 1093 (10th Cir . 1994). In that case, "[w]ith the exception of the first footnote (in which the BIA declined to address whether Petitioners hadfirmly resettled in Honduras), the BIA's decision contain[ed] no indication that it had undertaken a particularized consideration of Petitioners' case." Id. at 1098 (emphasis added). Because the BIA's opinion evidences its consideration of the individualized circumstances of Abdulai's application, we find no due process violation here.

IV.

We now come to the heart of the appeal. Though never finding that his testimony lacked credibility, the BIA held that Abdulai had not met his burden of pr oof due to his failure to introduce evidence corr oborating the specifics of his account.6 In so doing, the BIA applied its holding in In

_____

6. At oral argument, counsel for the Service suggested that a BIA finding that an applicant has failed to meet her bur den of proof necessarily encompasses a conclusion that the applicant's account was not credible. This is contrary to the Board's cases. In r e S–M–J–, Interim Decision 3303
(BIA 1997), available at 1997 WL 80984, explained the difference:

> Even if an alien is found to be credible, if there is no context within
> which to evaluate her claim, she has failed to met her burden of
> proof because she has not provided sufficient evidence of the
> foundation of her claim. A failure of pr oof is not a proper ground per
> se for an adverse credibility determination. The latter finding is more
> appropriately based upon inconsistent statements, contradictory
> evidence, and inherently improbable testimony.

(emphasis added). In other words, the BIA views"credibility" as involving only an analysis of the internal consistency and plausibility of an applicant's claim, whereas burden of pr oof analysis also involves consideration of all the surrounding evidence (or lack thereof).

Abdulai avers that we must assume that his testimony was deemed credible because neither the BIA nor the IJ ever explicitly found to the contrary. We acknowledge that such a rule pr evails in the Ninth Circuit, see, e.g., Kataria v. INS, 232 F.3d 1107, 1113 (9th Cir. 2000), but Abdulai points to no decision of this Court expr essly adopting such a rule. Because it does not affect our disposition of this matter, we will assume, without deciding, that Abdulai's testimony was credible.

13

re S-M-J-, Interim Decision 3303 (BIA 1997), available at 1997 WL 80984. S-M-J- established the following rules: (1) an applicant need not provide evidence corr oborating the specifics of his or her testimony unless it would be "reasonable" to expect the applicant to do so; but (2) if it would be "reasonable" to expect corr oboration, then an applicant who neither introduces such evidence nor offers a satisfactory explanation as to why he or she cannot do so may be found to have failed to meet his or her bur den of proof. Abdulai challenges both the BIA's authority to adopt this rule and its application in his case. W e conclude that: (1) the Board's rule is not per se invalid; but (2) because the BIA's decision in this case provides us with no way to conduct our (albeit limited) review, we will vacate its order and remand to allow it to explain in mor e detail its reasons for denying Abdulai's application. We note that, except with regard to our discussion of this Court's prior cases, see infra at pp. 17-19, our analysis as to both points tracks in considerable measure that contained in Judge W alker's persuasive opinion in Diallo v. INS, 232 F .3d 279 (2d Cir. 2000).

A.

We begin by acknowledging the narrow scope of our review. The Attorney General has been"charged with the administration and enforcement" of the INA, and Congress has provided that his "determination[s] and ruling[s] . . . with respect to all questions of law shall be controlling." 8 U.S.C. S 1103(a)(1). Because of this delegation, the Supreme Court has held that "principles of Chevr on deference are applicable" in the immigration context. INS v. Aguirre-Aguirre, 526 U.S. 415, 424 (1999). The Court has also emphasized that--because of the area's pr ofound foreign policy implications--"judicial deference to the Executive Branch is especially appropriate in the immigration context." Id. at 425. And because the Attorney General has vested the BIA with the power to exercise the"discretion and authority conferred upon [him] by law," see 8 C.F.R. S 3.1(d)(1) (2000), these principles of defer ence also apply to the BIA. See Aguirre-Aguirre, 526 U.S. at 425.

14

In determining whether the BIA may sometimes r equire corroboration of otherwise-credible testimony, we begin with the language of the INA. We accor d Chevron deference to the BIA's interpretations of the statute. See id. Our inquiry, therefore, is limited to deter mining whether "the statute is silent or ambiguous with respect to the specific issue," and, if so, "whether the agency's answer is based on a permissible construction of the statute." Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843 (1984).

The INA is completely silent as to whether, when it is reasonable to expect corroborating evidence, an otherwise-credible applicant who neither produces such corroboration nor adequately explains his or her failure to do so may be deemed to have failed to meet his or her bur den of proof. See Ladha v. INS, 215 F.3d 889, 897 (9th Cir. 2000) (noting the INA's silence on this issue). The statute simply says that a person is eligible for asylum "if the Attorney General determines that such alien is a refugee," 8 U.S.C. S 1158(b)(1), and that the Attorney General must grant withholding relief if he "decides that the alien's life or freedom would be threatened" in the alien's home country, id. S 1231(b)(3)(A). What the statute says nothing about, however, is whether the Attorney General may sometimes require corroboration or explanation in determining whether an alien is a refugee or deciding whether the alien's life or freedom would be threatened in his or her home country. Because the statute is silent, ther efore, the question is whether the BIA's interpretation is based on a permissible construction of the statute. In light of the INA's enormously broad delegation to the Attor ney General, we would be extremely reluctant to hold that his interpretation is unreasonable.

In support of Abdulai's position, amicus Lawyer's Committee for Human Rights invokes two regulations promulgated by the Attorney General, one dealing with asylum and the other with withholding of removal. Both regulations provide that "[t]he testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration." 8 C.F.R.S 208.13(a) (2000); Id. S 208.16(b). Amicus argues that these regulations establish

15

that the BIA may never require an applicant to corroborate otherwise credible testimony as a precondition for meeting his or her burden of proof. We disagree.

First, our standard of review is even mor e deferential when an agency is interpreting a regulation rather than a statute that it administers. See Applebaum v. Nissan Motor Acceptance Corp., 226 F.3d 214, 218 n.4 (3d Cir. 2000) (noting this distinction). An agency's interpr etation of its own regulation is "controlling . . . unless it is plainly erroneous or inconsistent with the regulation." Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414 (1945). But even setting aside the hefty deference to which the BIA is entitled, we conclude that amicus' r eading is contrary to the language of the regulation. The regulation states that credible testimony may be enough to meet the applicant's burden of proof. Saying that something may be enough is not the same as saying that it is always enough; in fact, the most natural reading of the word "may" in this context is that credible testimony is neither per se sufficient nor per se insufficient. In other words, "it depends." And, according to the BIA, it depends, at least in part, on whether it would be reasonable to expect corroboration. W e do not see how this construction is plainly erroneous or inconsistent with the regulation.

Amicus also invokes the United States' tr eaty obligations pursuant to the 1967 Protocol Relating to the Status of Refugees. The Protocol forbids any "contracting State" from expelling "a refugee in any manner whatsoever where his life or freedom would be threatened on account of his . . . political opinion." 1967 United Nations Pr otocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T . 6224, 6276, T.I.A.S. No. 6577. Amicus notes that a Handbook published by the Office of the United Nations High Commissioner for Refugees states that "the r equirement of evidence should . . . not be too strictly applied in view of the difficulty of proof inherent in the special situation in which an applicant for refugee status finds himself." See Amicus Br. at 19 (quoting Office of the United Nations High Commissioner for Refugees, Handbook on Pr ocedures and Criteria for Determining Refugee Status Under the 1951 Convention and the 1967 Protocol Relating to the Status of

16

Refugees 197 (Geneva 1992) (the Handbook)). Accordingly, the Handbook recommends that "if the applicant's account appears credible, he should, unless ther e are good reasons to the contrary, be given the benefit of the doubt." Amicus Br. at 20 (quoting the Handbook).

Amicus' argument suffers fr om two fatal flaws. First, the Handbook is not binding on the INS or American courts. See, e.g., Aguirre-Aguirre, 526 U.S. at 427. Second, the Handbook only recommends not requiring corroborating evidence "unless there are good r easons to the contrary." But because the BIA's rule only holds a failur e to corroborate against an applicant when: (1) it is "reasonable to expect" corroboration; and (2) the applicant has no satisfactory explanation for not doing so, "[t]he standard applied by the BIA adheres to [the Handbook's] general parameters," Diallo v. INS, 232 F .3d 279, 286 (2d Cir. 2000). We find nothing in the Handbook that renders the BIA's rule suspect on its face.

Abdulai presses a final claim based on stare decisis: He argues that this Court's precedent establishes that credible testimony is always sufficient to meet an applicant's burden of proof. The BIA is required to follow court of appeals precedent within the geographical confines of the relevant circuit. See Matter of Anselmo (Interim Decision), 20 I.&N. Dec. 25. 30-31 (May 11, 1989) (acknowledging this fact). And this panel is, of course, bound by the decisions of a prior panel. See 3d Cir. I.O.P . 9.1. Accordingly, if prior Third Circuit law establishes that an applicant's credible testimony is always sufficient to meet the bur den of proof, then the BIA was not permitted to requir e corroboration in this case and we must set aside the BIA's decision. Cf. Ladha, 215 F.3d at 899 (following this logic based on Ninth Circuit precedent).7

We disagree with Abdulai, however , that our cases have established the rule that he seeks. Abdulai places most

_____

7. In support of this argument, Abdulai and amicus cite numerous cases from other courts of appeals. Because we ar e not bound by precedent from other circuits and because we have concluded that only stare decisis could justify a ruling in Abdulai's favor, these decisions are not relevant to our disposition here.

17

emphasis on our decision in Senathirajah v. INS , 157 F.3d 210 (3d Cir. 1998).8 At one point in its opinion, the panel stated that: "corroboration is not r equired to establish credibility. The law allows one seeking r efugee status to prove his persecution claim with his own testimony if it is credible." Id. at 216 (quotation marks and citation omitted). Abdulai submits that this language clearly establishes that the BIA may not hold that an applicant has failed to meet his or her burden of proof simply because he or she has failed to produce corroborating evidence. Because we assume (for the sake of argument) that Abdulai's testimony was credible, see supra note 6, the sentence upon which he must be relying is the second one: "The law allows one seeking refugee status to prove his persecution claim with his own testimony if it is credible." The pr oblem for Abdulai, however, is that this statement was dicta.

The issue before us in Senathirajah simply had nothing to do with corroboration. That case involved an asylum applicant from Sri Lanka. See id. at 211. An IJ originally denied the application on several grounds. Importantly, the IJ found that the applicant's story had not been cr edible and also concluded that he had failed to meet his burden of proof because he had not corroborated his story. See id. at 213-14. The applicant then appealed to the BIA, which "conducted an independent examination of the r ecord, and also concluded that Senathirajah was not credible." Id. at 216. The BIA gave three reasons for concluding that the applicant lacked credibility--none of which involved his failure to provide corroboration. See id. at 216-17. Because we review only the BIA's decision, see supra page 9-10, there was simply no issue of corroboration before us in Senathirajah. This is confirmed by the fact that, other than the sentence from which Abdulai and amicus  seek to extract so much meaning, our analysis in Senathirajah contained no discussion of the corroboration issue. Though

_____

8. He also cites Balasubramanrim v. INS, 143 F.3d 157 (3d Cir. 1998), but that case simply states that "[w]hen documentary evidence is lacking . . . the applicant's credible, persuasive, and specific testimony may suffice." 143 F.3d at 165 (emphasis added). We return once again to a point we made earlier: saying that something may  suffice is not the same as saying that it always does.

18

we agree that Senathirajah suggests that it may be a bad idea to expect asylum applicants to provide corroborating evidence, that issue simply was not before us.

In sum, we have no warrant for concluding that the BIA's rule is per se invalid. The Board's rule is not foreclosed by the INA or the governing regulations, it is consistent with international standards, and it is not in conflict with our cases. We therefore hold that the BIA may sometimes require otherwise-credible applicants to supply corroborating evidence in order to meet their burden of proof.

B.

Our consideration is not ended, however, simply because we have concluded that the BIA's rule is not per se invalid. There remains the question whether it was properly applied here. The BIA's rule contemplates a three-part inquiry: (1) an identification of the facts for which "it is reasonable to expect corroboration;" (2) an inquiry as to whether the applicant has provided information corroborating the relevant facts; and, if he or she has not, (3) an analysis of whether the applicant has adequately explained his or her failure to do so. See In re S-M-J-, Interim Decision 3303 (BIA 1997), available at 1997 WL 80984.

In this case, the BIA seems to have focused on inquiry (2) (whether Abdulai had corroborated the specifics of his testimony), while completely ignoring the other two aspects of its own test. The Board's entire analysis reads:

> In the case at bar, we find that the respondent has not produced sufficient evidence to meet his burden of proof. We acknowledge that the respondent has submitted numerous articles and reports regarding general country conditions in Nigeria. However, we note the conspicuous lack of documentary evidence corroborating the specifics of the respondent's testimony. Therefore, given the complete lack of evidence corroborating the specifics of the respondent's asylum claim, we agree with the Immigration Judge that the respondent has failed to sustain his burden of proof in this matter.

19

What the BIA never explains, however, is what particular aspects of Abdulai's testimony it would have been reasonable to expect him to have corroborated. Without knowing that, it is impossible for us to review: (1) whether it was reasonable to expect Abdulai to corr oborate such information; (2) whether Abdulai provided the requisite corroboration; or (3) whether Abdulai adequately explained his inability to do so.

Nor is this an academic exercise. The BIA's own prior decisions establish that it is "reasonable" to expect an applicant to corroborate "facts which ar e central to his or her claim and easily subject to verification." In re S-M-J-, supra. It has included in this category "evidence of [an applicant's] place of birth, media accounts of large demonstrations, evidence of a publicly held office, or documentation of medical treatment." Id. The Board has also stated that it is generally reasonable to expect applicants to produce letters from family members remaining in the applicant's home country. See In re M-D-, Interim Decision 3339 (BIA 1998), available at 1998 WL 127881.9

Abdulai attempted to meet his burden under these rules. He submitted his Nigerian passport, and attempted to explain his inability to document his CD membership. At oral argument before this Court, the Service submitted that it is reasonable to expect Abdulai to have corr oborated his hospital visit in Nigeria following his final r elease from confinement. Though we are uncertain whether it would be reasonable to hold Abdulai's failure to pr ocure Nigerian hospital records against him (assuming, of course, that such records even exist), that concer n is ultimately beside

_____

9. In setting out this summary of the Boar d's case law, we express no opinion as to whether we agree that it is "r easonable" to expect applicants for asylum or withholding of removal to corroborate these types of information. We observe, however, that an applicant's ability to obtain corroborating evidence may often depend on the social and political circumstances of a given country. See, e.g., Asylum and Withholding of Deportation Procedur es, 52 Fed. Reg. 32552, 32553 (proposed March 7, 1991) ("[T]heflight or defection of a bona fide refugee from a country that engages in widespread persecution may leave him in a difficult position to corroborate his claim.").

20

the point. Because the BIA never stated which aspects of his story it would have been reasonable to corr oborate, we have no way of reviewing the Board's actual reasoning.

We acknowledge that our standard of r eview is extraordinarily deferential to the BIA, and that nothing in the INA specifically requires the Boar d to explain its decisions. But the availability of judicial r eview (which is specifically provided in the INA) necessarily contemplates something for us to review. In a case quite similar to this one, the Second Circuit vacated and remanded a decision by the BIA so that the Board could further explain its reasoning. See Diallo v. INS, 232 F .3d 279, 288-90 (2d Cir. 2000). We have done the same when deficiencies in BIA decisions have made them impossible to review meaningfully. See, e.g., Sotto v. USINS, 748 F.2d 832, 837 (3d Cir. 1984). Because the BIA's failur e of explanation makes it impossible for us to review its rationale, we grant Abdulai's petition for review, vacate the Boar d's order, and remand the matter to it for further proceedings consistent with this opinion.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

21