

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-9-2003

# Miah v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 01-3764

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Miah v. Atty Gen USA" (2003). *2003 Decisions*. Paper 166.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/166

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed October 9, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-3764

BISMILLAH MIAH,
Petitioner

v.

JOHN ASHCROFT, Attorney General of the United States;
IMMIGRATION & NATURALIZATION SERVICE,
Respondents

On Petition for Review of an Order of
the Board of Immigration Appeals
(INS No. A78 420 602)

Argued on January 16, 2003

Before: ROTH, FUENTES and ALDISERT, *Circuit Judges*

(Opinion Filed: October 9, 2003)

Brian P. Downey [Argued]
Pepper Hamilton
200 One Keystone Plaza
North Front & Market Streets,
P.O. Box 1181
Harrisburg, PA 17108

Barak A. Bassman
Pepper Hamilton
18th & Arch Streets
3000 Two Logan Square
Philadelphia, PA 19103

Angelo Stio
Pepper Hamilton
300 Alexander Park
Princeton, NJ 08543

*Counsel for Petitioner*

David V. Bernal
Christopher C. Fuller
William C. Minick
Anthony C. Payne [Argued]
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, DC 20044

*Counsel for Respondents*

---

## OPINION OF THE COURT

---

*FUENTES*, Circuit Judge:

Bismillah Miah ("Miah"), a national of Bangladesh, petitions for review of a decision of the Board of Immigration Appeals ("BIA" or "Board") ordering him removed to his home country. The Immigration Judge had denied Miah's petition for political asylum and withholding of removal on the basis that Miah's testimony lacked sufficient credibility and corroboration to sustain the burden of proof. The BIA, rejecting the Immigration Judge's adverse credibility determination, nonetheless dismissed the appeal because the petitioner failed to corroborate the events on which he based his claim. We agree with petitioner that the BIA failed to properly analyze the issue of corroboration in accordance with previous rulings of this Court. We therefore vacate the BIA's order and remand the matter for further proceedings consistent with this opinion.

## I.  Background

### A.  *Procedural*

Miah attempted to enter the United States on November 11, 2000, at John F. Kennedy International Airport in New

York, New York. He was denied admission to the United States and detained by the Immigration and Naturalization Service for a full asylum hearing after an INS officer determined that Miah had established a credible fear of persecution if returned to Bangladesh. The INS initiated removal proceedings against Miah, charging him as inadmissible pursuant to Section 212(a)(6)(C)(I) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1182(a)(6)(C)(I), as an alien who sought admission by fraud or willful misrepresentation. Miah was also charged as inadmissible under Section 212(a)(7)(A)(i)(I) of the INA, 8 U.S.C. § 1182(a)(7)(A)(i)(I), as an immigrant not in possession of a valid entry document. On January 29, 2001, Miah appeared before an Immigration Judge ("IJ") and denied that he was removable under section 1182(a)(6)(C)(I). He conceded removability under section 1182(a)(7)(A)(i)(I); but, he requested political asylum, withholding of removal, and relief under the United Nations Convention Against Torture.

The IJ held a hearing on Miah's application for relief on February 21, 2001. Thereafter, on April 11, 2001, the IJ denied Miah's application on all grounds of requested relief. Two aspects of the IJ's decision are relevant to this appeal. First, the IJ determined that Miah's testimony was not credible because it lacked sufficient detail. A.R. 34. Second, the IJ concluded that the documentation submitted by Miah failed to corroborate any of the incidents described in his testimony. *Id.* at 35.

Specifically, the IJ noted that a letter from Miah's father lacked detail regarding any of the alleged incidents. *Id.* The IJ also commented that, other than the letter from his father, Miah neglected to submit any letters or affidavits from any witnesses to the alleged incidents, such as other members of his political party, his employees, or other family members. *Id.* Finally, the IJ found that, while Miah submitted a doctor's note indicating that he received treatment during three periods of time, the note lacked details regarding Miah's injuries and treatments and contained some dates that did not coincide with the dates described in Miah's testimony and written application. *Id.*

On May 11, 2001, Miah filed a Notice of Appeal of the IJ's decision with the BIA. The BIA dismissed the appeal on September 17, 2001. Although the BIA dismissed the appeal, it did not accept all of the IJ's conclusions. After indicating that the IJ placed undue weight on Miah's airport statement and mistakenly relied on the fact that Miah escaped harm until 1999, the BIA rejected the IJ's adverse credibility finding. *Id.* at 3. However, the BIA agreed with the IJ that Miah failed to meet his burden of proof due to a lack of corroboration. *Id.* In reaching this conclusion the BIA took note of several findings made by the IJ: (1) the letter from Miah's father did not provide specific details regarding any of the incidents described by Miah; (2) the doctor's note supplied by Miah was unpersuasive; and (3) Miah failed to obtain specific factual statements from his employees, other members of his political party, or family members who witnessed the incidents on which his claim is based. *Id.* After observing that Miah neglected to offer an explanation for these shortcomings on appeal, the BIA concluded that the IJ correctly ruled that Miah failed to carry his burden of proof.

On October 3, 2001, Miah filed a Petition for Review and Motion to Stay Removal with this Court. Thereafter, we granted a Motion to Stay Removal pending the outcome of the instant appeal.

B. *Miah's Account and Supporting Evidence*

Miah, a thirty-six year old citizen of Bangladesh, joined the Bangladesh National Party ("BNP") on April 17, 1992. At that time, the BNP held power in Bangladesh. Initially, during 1992 and 1993, Miah worked as a supporter of the party, helping with donations, participating in meetings and processions, and engaging in publicity using a loudspeaker.

Gradually, Miah rose through the BNP hierarchy. In 1994, he became the local publicity secretary in the city of Noakhali. As local publicity secretary, Miah hung posters, put up banners, and used a loudspeaker to announce BNP activities and meetings. He also served the branch committee of the party. In 1998, Miah was elected organizing secretary in the Noakhali district. He served as one of three BNP officials in charge of organizing party

activities in a city of two million. His responsibilities included organizing volunteers, ensuring participation at meetings, and arranging for publicity.

On March 30, 1996, the BNP lost the national election in Bangladesh and a rival political party, the Awami League, came to power. Under control of the Awami League, the government has harassed political opponents through the use of various tactics, including arbitrary detentions and limitations on the freedom of assembly. Because of his work on behalf of the BNP, Miah became a target of Awami League supporters.

In Miah's case, the harassment started on July 9, 1999, when Awami League supporters beat Miah and his brother outside of their home. The men warned Miah to quit the BNP and join the ruling party. Five months later, on December 1, 1999, Awami League activists kidnaped Miah on his way home from the store that he operated. The men stopped their car on the street in front of Miah, forced him into their car, and blindfolded him. They brought Miah to a room where he was held and beaten for two days. The Awami League supporters released Miah only after he promised to quit the BNP and join the ruling party.

Despite his promise to the contrary, Miah continued to work on behalf of the BNP. On August 15, 2000, while he walked the streets of Noakhali, Miah used a loudspeaker to publicize an upcoming BNP meeting. In response to this conduct, the police seized Miah, took him to the local station, and beat him. Upon learning of the situation, other BNP party members protested in front of the police station until Miah was released.

Two weeks later, on September 1, 2000, Awami League supporters looted and burned Miah's store and attacked two of his employees. Because Miah was not present in the store at the time of the incident, the Awami League supporters came looking for him at his house later that night. After hearing the sounds of cars and gunfire on the streets surrounding his home, Miah climbed to the roof to see what was happening outside. He saw men enter his home. Once inside, the men beat Miah's mother and father and demanded to know the whereabouts of Miah. Upon

hearing the screaming and shouting from inside of the house, Miah jumped to the roof of the next house, which was owned by his uncle, and escaped to the street. Miah's brother was kidnaped by the Awami League workers who raided the house. No one has heard from Miah's brother since that night and the police refused to register a complaint against the ruling party when Miah's father went to report the kidnaping.

Miah fled to a nearby city and hid in the homes of BNP leaders. While there, he learned that the police were seeking to arrest him and file false charges against him. He also learned that Awami League activists had been seen in cars circling his home. They continued to threaten Miah's friends and relatives in an attempt to locate him.

On September 9, 2000, Miah returned to Noakhali, where Awami League workers attacked him again after learning that he had returned. A few weeks later, on October 20, 2000, Miah was on his way to a BNP leader's home when he noticed Awami League workers waiting outside the house in a car. As soon as he saw them, Miah ran away. The men shot at Miah as he ran, but he escaped unharmed.

After consulting with BNP leaders about the situation, Miah secured a passport with their assistance and made plans to leave Bangladesh. He left Bangladesh on November 10, 2000, and arrived at John F. Kennedy International Airport the following day.

Miah submitted various documents in support of his application including: photographs; evidence of his membership in the BNP; a letter from his father; a note from a medical doctor; newspaper articles; and a birth certificate. The letter from Miah's father and the note from the doctor are the pieces of documentary evidence most relevant to this appeal.

In his letter, Miah's father describes the situation in Bangladesh and warns Miah not to return.[1] Specifically, his father writes that: "[w]e have not yet got any information about your brother. I went to the police station. They did

---

1. The letter has been translated from Bengali into English.

not register any case. At the directive of the ruling party leaders the police and the ruling party people have become united." A.R. 290. The father continues by describing the activities of "the ruling party people," who circle the house in cars, threaten to set the house on fire, and search the residences of Miah's relatives in an attempt to find Miah. *Id.* Finally, the father ends the letter by telling Miah not to return to Bangladesh and "[d]on't write letters home." *Id.*

In the note, Dr. Md. Salahuddin Sharif writes that he treated Miah for injuries on three different occasions. *Id.* at 288. He writes that Miah was treated from July 9 to August 8, 1999, from December 3 to December 18, 1999, and from August 15 to August 25, 2000. *Id.* The note indicates that the care received during the first stay was for a leg injury, but the note contains no details about the treatment received during the other two periods. *Id.* Dr. Sharif concludes by stating that "[t]his facts is [sic] consistent with his injuries." *Id.*

## II.  Discussion

The Attorney General may exercise his discretion to grant asylum to an applicant "if the Attorney General determines that such alien is a refugee within the meaning of section 1101(a)(42)(A)." 8 U.S.C. § 1158(b)(1). Section 1101(a)(42)(A) defines "refugee" as

> any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . . .

8 U.S.C. § 1102(a)(42)(A). The asylum applicant bears the burden of establishing that he or she qualifies as a "refugee." *See* 8 C.F.R. § 208.13(a) (2001). A grant of asylum allows a removable alien to remain in the United States.

"Withholding of removal, in contrast, confers only the right not to be deported to a particular country — not a right to remain in this one." *Abdulai v. Ashcroft*, 239 F.3d 542, 545 (3d Cir. 2001) (citing *INS v. Aguirre-Aguirre*, 526 U.S. 415, 419 (1999)). An alien is entitled to withholding of removal "if the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). In contrast to the discretionary relief available to individuals who qualify for political asylum, "if an alien qualifies for withholding of deportation . . . then the Attorney General is prohibited from deporting the alien to the country where the prosecution will occur." *Lin v. INS*, 238 F.3d 239, 244 (3d Cir. 2001) (citing *INS v. Cardoza-Fonseca*, 480 U.S. 421, 429 n.6 (1987)). To qualify for mandatory relief under withholding of deportation, an applicant must show that it is more likely than not that he will face persecution if he is deported. *See id.* (citing *Cardoza-Fonseca*, 480 U.S. at 430).

We have jurisdiction to review a final order of removal pursuant to 8 U.S.C. § 1252(a)(1). The final order we normally review is the decision of the BIA, unless the BIA defers to the IJ's findings. *See Abdulai*, 239 F.3d at 549 n.2. In this case we need to consider both the decision of the IJ and the BIA because the BIA adopted the IJ's analysis on corroboration while rejecting the IJ's conclusion regarding credibility, a conclusion which influenced the IJ's corroboration analysis.

A. *Corroboration*

On appeal, Miah claims that the BIA erred in finding that he did not adequately corroborate his testimony in support of his application for asylum and withholding of removal.[2] In particular, Miah makes two main points. First, Miah

---

2. On appeal, Miah also argues that "[t]he BIA erred in dismissing [his] appeal of the Immigration Judge's decision denying him relief under the Convention Against Torture." Br. Pet. at 24. We will not consider this issue because we find that Miah failed to raise the IJ's decision on his Torture Convention claim as an issue to be considered by the BIA. This Court may not consider particular questions not raised in an appeal to the Board. *See Alleyne v. INS*, 879 F.2d 1177, 1182 (3d Cir. 1989).

argues that the BIA has placed a non-specific corroboration requirement on an otherwise credible witness in direct violation of this Court's holding in *Abdulai.* Second, Miah claims that the BIA sought to impose that requirement on a record in which every fact that could be corroborated had been corroborated.

In *Abdulai* we held that "the BIA may sometimes require otherwise-credible applicants to supply corroborating evidence in order to meet their burden of proof." 239 F.3d at 554. In particular, we recognized a three-part test for determining whether an applicant could be required to provide corroborating evidence: "(1) an identification of the facts for which 'it is reasonable to expect corroboration;' (2) an inquiry as to whether the applicant has provided information corroborating the relevant facts; and, if he or she has not, (3) an analysis of whether the applicant has adequately explained his or her failure to do so." *Id.* (setting forth BIA's own test from *In re S-M-J-,* Interim Decision 3303 (BIA 1997), available at 1997 WL 80984).

In assessing whether the BIA properly applied this test in *Abdulai,* we found that the BIA focused on inquiry (2) and ignored the other two aspects of the test. *See id.* Specifically, while the BIA emphasized that Abdulai failed to produce documentary evidence corroborating the specifics of his claim, the BIA neglected to explain which "*particular* aspects of [his] testimony it would have been reasonable to expect him to have corroborated." *Id.* (emphasis in original). We noted that Abdulai attempted to meet his burden of corroboration by submitting his Nigerian passport and trying to explain his inability to document his membership in a particular political party. *See id.* at 555. However, because the BIA never identified the aspects of Abdulai's story for which it would have been reasonable to expect corroboration, we concluded that we could not decide whether its decision that Abdulai failed to produce sufficient corroborating evidence was supported by substantial evidence. *See id.* While acknowledging that "our standard of review is extraordinarily deferential to the BIA," we ruled that the BIA's failure to explain its rationale precluded a meaningful review and remanded the matter for further proceedings. *Id.*

Similarly, in this case the BIA's failure to provide its *own* rationale precludes meaningful review. The BIA merely reiterated the IJ's findings regarding Miah's attempts to corroborate his story. A.R. 3-4. In relevant part, the BIA stated as follows: (1) "[w]hat the Immigration Judge found lacking, in light of the weaknesses in the respondent's oral and written testimony, was specific corroboration of the events on which he bases his claim;" (2) "[t]he Immigration Judge noted that the letter from the respondent's father did not provide specific information corroborating any of the incidents described by the respondent;" (3) "[s]he also found the letter from the doctor who claims to have treated the respondent unpersuasive;" (4) "[t]he Immigration Judge also specifically noted the lack of any apparent attempt on the part of the respondent to obtain specific factual statements from employees, BNP members, or family members who reportedly witnessed the 1999 and 2000 incidents on which it [sic] his claim is based and seemingly could have provided corroboration regarding what transpired;" and (5) "[w]e accordingly agree with the Immigration Judge that the respondent failed to meet his burden of proof." *Id.* at 3-4.

While it might be appropriate for the BIA to adopt an IJ's findings regarding corroboration in certain cases, the BIA erred by doing so in this case. Here, the IJ found Miah to be not credible because his "testimony regarding the alleged incidents lacked sufficient detail." *Id.* at 34. As a result, the IJ believed that Miah needed to present additional corroborating evidence in order to carry his burden of proof as "none of the documentation submitted by [Miah] specifically corroborates any of the alleged incidents." *Id.* at 35. In contrast, the BIA found Miah to be credible, stating that it would "not adopt the Immigration Judge's adverse credibility finding." *Id.* at 3. Nonetheless, the BIA essentially adopted the IJ's corroboration findings. Given that the IJ's corroboration ruling was informed by its adverse credibility determination, we conclude that the BIA should have conducted an independent corroboration analysis.

In this case, testimony found to be incredible by the IJ was transformed into credible testimony by the BIA. However, the BIA does not explain how the transformation affects the degree of corroboration now required for Miah to

sustain his burden of proof. In other words, now that Miah is deemed to be a credible asylum applicant, which of the events on which he bases his claim must he now corroborate and to what degree? Is the level of corroboration the same as when his testimony was deemed incredible?

Rather than simply restating the findings of the IJ regarding corroboration, the BIA either should have explored the issue and reached its own conclusion, or remanded the case to the IJ with instructions to conduct another corroboration analysis given that the BIA had deemed Miah credible. While we acknowledge that our standard of review is extremely deferential to the BIA, we find that we cannot conduct a meaningful review of the BIA's decision in this case given that it adopted a conclusion of the IJ after rejecting the finding of the IJ which informed that conclusion. *See Abdulai*, 239 F.3d at 551. Here, "[b]ecause the BIA's failure of explanation makes it impossible for us to review its rationale," *id.* at 555, we remand the matter to the BIA so that it can refer the case to the IJ with instructions to assume credibility and conduct a new corroboration analysis.

B. *Further Proceedings*

In analyzing corroboration on remand the IJ should consider whether specific corroboration of the events on which Miah bases his claim is necessary now that the BIA has deemed Miah to be credible. If the IJ determines that corroboration is still warranted, then the IJ must identify "the facts for which it is reasonable to expect corroboration." *Id.* at 554. In her original opinion, the IJ found that "none of the documentation submitted by the respondent specifically corroborates any of the alleged incidents" and that, other than the letter from his father, Miah "has not submitted any letters or affidavits from any witnesses to the alleged incidents." A.R. 35. We note that, for many of the incidents described by Miah, there were no witnesses present who could now attest to what occurred. For example: (1) on July 9, 1999, Awami League workers attacked Miah and his brother, who is now missing; (2) on December 1, 1999, Awami League workers kidnaped Miah while he was walking home alone from work; and (3) on

September 9, 2000, Awami League workers again attacked Miah upon his return to Noakhali. It is also unclear whether there are any potential witnesses available from the one incident — the attempted shooting of October 20, 2000 — that the IJ specifically cited in her opinion as requiring corroboration. While Miah indicated in his testimony that he was going to the home of a BNP leader after a party meeting when he noticed the Awami League men waiting outside in a car, he did not testify that anyone else was walking with him or that anyone else fled the scene with him.

The BIA has stated that an applicant can be expected to corroborate "facts which are central to his or her claim and easily subject to verification," such as "evidence of [an applicant's] place of birth, media accounts of large demonstrations, evidence of a publicly held office, or documentation of medical treatment." *In re S-M-J-*, *supra*. The BIA has further stated that in most circumstances an applicant can reasonably be expected to produce letters from family members remaining in the applicant's home country. *See In re M-D-*, Interim Decision 3339 (BIA 1998), available at 1998 WL 127881. Miah has produced evidence of his place of birth, evidence of party membership and activities, documentation of medical treatment, and a letter from his father, who remains in Bangladesh. There are certain incidents, such as the September 1, 2000 attack on Miah's store and home, which other individuals witnessed and for which Miah has produced no specific corroboration. Assuming credibility, the IJ must now determine whether it is reasonable to expect such specific corroboration, or whether Miah's credible testimony about specific incidents, coupled with the documentary evidence that corroborates his claim in general, is sufficient.

If the IJ decides that it is reasonable to expect corroboration, then the IJ will have to determine whether Miah has provided specific information corroborating the relevant facts. Previously, in describing the IJ's findings, the BIA noted that the doctor's letter "was created long after the purported medical treatment and is not fully consistent with the time frame alleged by the respondent" and does not describe his injuries or treatment. A.R. 4. While we

agree that the note lacks information regarding Miah's injuries and treatment, the time periods contained in the note coincide with incidents described in Miah's claim. Each treatment period immediately follows an attack on Miah. The IJ should also consider whether it is reasonable to expect contemporaneously created records from a doctor in a developing country, where the level of medical care and record-keeping may not rise to the level of that available in the United States.

As to the father's letter, the IJ indicated that it "is lacking in detail regarding any of the alleged incidents." *Id.* at 35. While Miah's father may not provide details about any attacks on Miah, he does confirm other allegations made in Miah's claim. Though the letter is not translated into perfect English, the father confirms that Miah's brother is missing and that the police, acting in conjunction with the Awami League, are refusing to cooperate in finding him. He further indicates that Awami League workers are circling the family's home in cars and threatening the family in an attempt to learn the whereabouts of Miah. Again, the IJ must determine whether Miah has sustained his burden of proof by producing such corroborating evidence in addition to his credible testimony.

If the IJ nonetheless determines that Miah has not corroborated the relevant facts, then the IJ must determine "whether the applicant has adequately explained his or her failure to do so." *Abdulai*, 239 F.3d at 554. The IJ previously concluded that Miah had "not provided or indicated that he attempted to obtain letters or affidavits" from the employees at the store, other members of the BNP, or from other members of his family. A.R. 35. While offering no opinion at this time as to whether it would be reasonable to expect Miah to obtain letters or affidavits from employees and other members of the BNP, we recognized above that the BIA has indicated that, generally, an applicant can reasonably be expected to produce letters from family members remaining in the applicant's home country. *See In re M-D-, supra.* We instruct the IJ to consider the letter from Miah's father in assessing whether Miah has adequately explained his failure to corroborate certain relevant facts. In the letter, the father admonishes

Miah "[d]on't write letters home." The IJ failed to consider this fact in her opinion and it is clearly relevant to determining whether Miah has explained his failure to corroborate.

### III. Conclusion

Accordingly, for the reasons stated above, we grant Miah's Petition to Review the Order of the BIA, vacate the BIA's order, and remand the matter to the BIA to instruct the IJ to conduct further proceedings consistent with this opinion.

A True Copy:
       Teste:

*Clerk of the United States Court of Appeals
for the Third Circuit*